# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>32.42 ACRES OF LAND, MORE OR LESS LOCATED IN SAN DIEGO COUNTY STATE OF CALIFORNIA; et al,<br><br>Defendants. | CASE NO. 05cv1137 DMS (WMc)<br><br>**ORDER DETERMINING WHETHER VALUATION OF CONDEMNED LAND MAY BE BASED ON THE DIFFERENCE BETWEEN THE UNRESTRICTED FEE AND RESTRICTED LEASEHOLD VALUES** |

Pending before the Court is a motion filed by Defendant San Diego Unified Port District ("Port"), in which the Port seeks a ruling regarding its proposed valuation methodology for just compensation due to it following the United States' condemnation of 32.42 acres of historic tidelands on behalf of the United States Navy. For the following reasons, the Court concludes that valuation of the Port's interest based on the difference between the property's unrestricted fee value and United States' leasehold value does not satisfy Federal Rule of Evidence 702, and therefore, an opinion utilizing such methodology is not admissible at trial.

/ / /

/ / /

## I.

## BACKGROUND

Because the facts are well known the parties, the Court sets forth only those facts relevant to the disposition of this motion. The United States has condemned 32.42 acres of tide and submerged lands located at the south side of North Harbor Drive at Nimitz Boulevard on the San Diego Bay. In 1949, as part of a comprehensive exchange agreement[1] between the United States and the City of San Diego, the Navy received a long-term lease of the property for 50 years with a right of renewal for an additional 50 years. (*See* Doc. 52, Ex. A.) The lease included several provisions, including: (1) the United States paid no rent; (2) the United States was given the right "to make alterations, attach fixtures, and erect additions, structures or signs in or upon the premises," and those improvements would remain the property of the United States, which it could abandon on the property, unless the City objected; (3) the property could be used only for military purposes, and if there were a failure of that condition or if the property was abandoned, the property would revert to the City; and (4) the United States could not assign or sublet the leasehold. (Doc. 49, Ex. 1.)

In 1963, the City conveyed its interest in the property to the Port District. The Port remains the successor in interest to the property. On December 5, 1996, the Navy exercised its option to extend the lease for an additional 50 years. The Port and the California State Lands Commission ("Commission") opposed the extension on grounds that the lease was invalid. The United States then sought to condemn the Port and the Commission's interest in the subject property. Pursuant to the terms of a settlement in *United States v. 32.38 Acres of Land*, Case No. 99cv1622 (S.D.Cal. 2000), the United States was given a leasehold interest in the property through August 8, 2049.

On May 31, 2005, the United States filed the instant action to condemn the property, estimating just compensation at $237,500. In its declaration of taking, the United States asserts that it is condemning the Port's fee simple estate, including the State of California's tidelands trust rights and any subsurface or mineral rights, "but excluding the [leasehold] interest of the United States" and any public utility easements. (Doc. 2, Sched. C.) On January 6, 2006, the Port filed its objections to the

---

[1] Under the agreement, the United States granted the City fee simple title to the property and improvements that are now San Diego's Lindberg International Airport in exchange for eight leasehold interests and fee title to one property in and around the City of San Diego.

- 2 - 05cv1137

1  United States' condemnation of the Subject Property. On January 9, 2006, the Commission filed a
2  separate motion for summary judgment, challenging the United States' authority to extinguish the
3  State's public trust rights in the land. This Court issued an order overruling the Port's objections and
4  denying the Commission's motion on April 26, 2008. (Doc. 24.) The Commission's motion was
5  denied on grounds that the taking by the United States extinguished California's public trust easement.
6  (*Id.*, at 5-8.) This Court found that:

> with respect to the 27.54 acres of lands which are filled and are not subject to the tidelands, the United States takes the lands free of any public trust restrictions. As to the remaining 4.88 acres which are within the bulkhead line but remain tidelands, the United States acquires the property subject to its own federal trust.

(*Id.*)

Thereafter, on October 28, 2008, this Court issued an order determining that the land should be valued as burdened by California's tidelands trust, but that condemnation of the trust itself – as a nonpecuniary sovereign attribute – was not compensable. (Doc. 43, at 8.)

## II.
## LEGAL STANDARD

Federal Rule of Civil Procedure 71.1 (renamed from Rule 71A in 2007) governs procedural matters in a federal condemnation cases. *Kirby Forest Indus., Inc. v. United States*, 467 U.S. 1, 3-4 (1984). "In an action involving eminent domain under federal law, the court tries all issues, including compensation, except when compensation must be determined" by a specially constituted tribunal, jury, or court-appointed commission. Fed. R. Civ. P. 71.1(h). Rule 71.1 permits the jury to decide only the "precise issue of the amount of compensation to be awarded," a decision which is to be made "within ground rules established by the trial judge." *United States v. Reynolds*, 397 U.S. 14, 20 (1970) Consequently, the trial court is responsible for making preliminary determinations that affect the valuation of condemned property. *See Scott Lumber Co. v. United States*, 390 F.2d 388, 392 (9th Cir. 1968) (court determines legality of potential uses for condemned land prior to valuation).

"[J]ust compensation is the value of the interest taken." *United States v. Petty Motor Co.*, 327 U.S. 372, 377 (U.S. 1946). It is measured by "the market value of the property at the time of the taking contemporaneously paid in money." *Olson v. United States*, 292 U.S. 246, 255 (1934). Market value is defined as "the price which a reasonable seller who desires to sell but is not required to sell would

1  demand for the property and the price which a reasonable buyer who desired to buy but was not
2  required to buy would pay for the same." *United States v. 429.59 Acres of Land*, 612 F.2d 459, 462
3  (9th Cir.1980). It is settled that just compensation is determined by the owner's loss, not the taker's
4  gain. *United States ex rel T.V.A. v. Powelson*, 319 U.S. 266, 281 (1943). A property owner "is
5  entitled to be put in as good a position pecuniarily as if his property had not been taken. He must be
6  made whole but is not entitled to more." *Olson*, 292 U.S. at 255.

## III.
## DISCUSSION

9  The United States and the Port agree that the proper measure of just compensation in this case
10 is the property's fair market value on the date of taking, May 31, 2005. But the parties disagree as to
11 the proper valuation methodology. The Port seeks a ruling on the admissibility of appraisal expert
12 evidence, arguing that valuation of its lease fee interest may be based on the difference between the
13 subject property's unrestricted fee value and the leasehold value. The United States argues that the
14 motion does not address an evidentiary issue; rather, the Port seeks a ruling as to the proper measure
15 of just compensation. Although the Port describes its expert's methodology and the legal basis for the
16 appraisal, it does not provide the Court with the appraisal. Accordingly, the Court construes the
17 motion as a request for a legal determination that the Port's expert's methodology is a reliable method
18 of computing just compensation. *See* Fed. R. Evid. 702.

19 The Port contends that the fair market value of its interest can be determined by the difference
20 between the fair market value of the subject property at its highest and best use and the value of the
21 United States' leasehold interest. It argues that valuation should proceed according to the "undivided
22 fee rule," citing *United States v. 1.377 Acres of Land*, 352 F.3d 1259, 1269 (9th Cir. 2003). Under this
23 rule, the government provides just compensation for its taking, and the award is then apportioned
24 among parties holding various interests in the condemned property. *1.377 Acres of Land*, 352 F.3d
25 at 1269 According to the Port, their appraiser properly determined the value of its interest using the
26 following method: (1) the value of the fee simple absolute is determined; (2) the value of the United
27 States' leasehold interest is then determined; and (3) the difference between the two constitutes the
28 Port's award.

1       The United States contends that this methodology is improper because the United States is not condemning the entire fee. Instead, it is only condemning the Port's reversionary lease fee interest, which becomes possessory in 2049 upon expiration of the lease. It cites *Richland Irrigation Dist. v. United States*, 222 F.2d 112, 114 (9th Cir. 1955), for the proposition that the filing of a declaration of taking condemns the described property interest, vesting the United States with title and obligating it to pay just compensation for the condemned interest only. It further argues that the "undivided fee rule" is a rule of allocation, not valuation, such that it determines the value of a condemnee's interest where the condemnee owns an interest in property that has been condemned. According to the United States, such a rule is inapplicable here because, as the lessee, it is condemning the Port's reversionary lease fee interest only, not the entire fee. It argues that the proper valuation question is what a buyer would pay for the Port's interest on the date of the taking, given that (1) the lease expires in 2049; (2) the buyer may be responsible for demolishing improvements on the land; and (3) the buyer may gain possession before 2049, if the United States ceases using the property for military purposes or abandons it.

       The Court agrees. In *Burkhart v. United States*, the Ninth Circuit reversed the trial court's determination that lessees were not entitled to just compensation because the service station they owned was not condemned by the government. 227 F.2d 659, 662 (9th Cir. 1955). The lower court erred by determining the extent of the condemnation by examining the condemnees' lease provisions and the character of the improvements on the property, instead of the declaration of taking. *Id.*, at 661. The Ninth Circuit noted that while a declaration of taking wipes out all interests in the property and just compensation must be paid for the whole, the United States may specifically except interests from the condemnation if those interests are specifically described in the declaration. *Id.*, at 661-62. After reviewing the declaration, the Ninth Circuit concluded that the United States condemned less than the fee simple, but remanded the case to the trial court because the declaration was ambiguous as to what lesser interests were, in fact, condemned. *Id.*, at 662-63. Here, the declaration of taking states that the United States is condemning the fee simple, except for its leasehold and the public utilities easements, but including California's tidelands trust. As this Court previously found, no compensation is due for the tidelands trust as it is not a compensable private interest. (Doc. 43, at 8.) Therefore, the Port's

1  reversionary lease fee interest is condemned, but not the leasehold interest.

2  How then is the Port's interest to be valued? In the usual case, the lessor's interest is part of a divided fee, and pursuant to the "undivided fee rule," the value of a lessor's fee interest is usually determined at the allocation, not the valuation stage. *1.377 Acres of Land*, 352 F.3d at 1269. Nevertheless, a lessor's fee interest generally consists of the rights to collect agreed-upon rents and repossess (and re-lease) the property upon expiration of the lease. *State ex rel. State Public Works Board v. Whitlow*, 243 Cal. App. 2d 490, 498 (Cal. App. 3d Dist. 1966). "Thus, the measure of the value of the Lessor's interest is: (a) The present worth (discounted value) of the future net rents under the terms of the lease: in addition to (b) The present worth (discounted value) of the property at the end of the lease, which is called the reversionary value." *Id.* (quoting Schmutz, The Appraisal Process, § 3510 (1959).) The present value of the reversionary interest is computed by forecasting the fair market value of the property at the end of the lease, then calculating how much one would need to invest at the time of taking to receive the forecast fair market value at a market interest rate. *Devers v. Chateau Corp.*, 792 F.2d 1278, 1283 (4th Cir. 1986) (*citing* S. Kahn and F. Case, Real Estate Appraisal and Investment, 161 (2d ed. 1977).) This figure is often "quite small" because "[t]he rental stream, not the reversion, is the item of worth" in a long-term lease with little danger of default. *Id.* (citing 4 Nichols' The Law of Eminent Domain § 12.42[3] (3d ed. 1985) & 1 L. Orgel, Valuation Under the Law of Eminent Domain, § 122 at 529 (2d ed. 1953)). As explained in *Whitlow,* the method to determine the lessor's interest is to (1) determine the fair market value of the property as though there were no leases; (2) determine the present value of the lessor's reversionary interest; (3) determine the present value of rental income over the lease period; and (4) the sum of the reversionary interest and the rental income values equals the lessor's present interest. 243 Cal. App. 2d at 497. The value of the leasehold may then be determined as the difference between the lessor's present interests and the property's fair market value. *Id.* In *Whitlow,* the use of this methodology for valuation – normally reserved for allocation – was found proper where the State of California, as a lessee, condemned the lessors' interest but not its own leasehold interest. *Id.*, at 497-99.

The Port cites Condemnation Practice in California § 10.6 (Cal CEB 2008), for the proposition that the *Whitlow* formula assumes that the lessee has the right to use the property at is highest and best

use, and that where lease provisions restrict the property's use, the lessor is entitled to additional compensation to be measured as the difference between the value of the property's highest and best use and the lessee's actual use. However, this method is improper where the government is the lessee and the lease restricts the property's use to government business only. *Whitlow,* 243 Cal. App. 2d at 498. A leasehold that is restricted to governmental uses has no market value because a reasonable buyer would not purchase land he cannot use. *Id.* Consequently, the difference between the highest and best use and the leasehold value is equal to the highest and best use. Applying this method is "nonsense," because the difference between the value of the highest and best use and the leasehold is equal to the highest and best use value and the government would therefore be required to pay compensation for a leasehold that it already owns. *Id.* Here, the lease restricts use of the property to military or naval purposes, and in the absence of such use, the leasehold reverts to the Port. (Mot., Ex. A, ¶4.) Because a reasonable, private buyer would not purchase a leasehold with such conditions, the leasehold has no market value. The Port's methodology is therefore flawed.

Nor is it sound to value the United States' leasehold interest by using comparable sales data and substitute facilities costs because the subject property has no market value. Deviation from the fair market value measure of just compensation is required only "when market value has been too difficult to find, or when its application would result in manifest injustice to owner or public." *United States v. Commodities Trading Corp.*, 339 U.S. 121, 123 (1950). While determining the fair market value of the United States' leasehold interest may be difficult, it is not the interest at issue; rather, it is Port's lease fee interest that has been condemned, and its market value is readily ascertainable.

The Port further argues that special rules govern this case, because the lease includes a provision that gives it the possibility of reverter during the lease term if a provision in the lease restricting its use is breached. Generally, no compensation is due to a holder of a possibility of reverter unless the reversion is reasonably probable within a short period of time of condemnation. *See Woodville, Okl. v. United States,* 152 F.2d 735, 738-39 (10th Cir. 1946). The Port relies on an exception to this rule, citing cases where the holder of an otherwise worthless reversionary future is awarded compensation because the condemnor-grantee condemned the grantor's future interest to avoid the restrictions. *See e.g., Leeco Gas & Oil Co. v. County of Neuces,* 736 S.W.2d 629 (Tex.

1987); *Ink v. City of Canton,* 212 N.E.2d 574, 579 (Ohio 1965); *City of Palm Springs v. Living Desert Reserve,* 70 Cal. App. 4th 613 (1999). The cases cited by the Port are distinguishable, however, because they all involve donations of land to public entities, where the donor made a conditional gift of the property. The courts awarded compensation based on equitable concerns: by condemning the future interest in a donated property subject to use restrictions, the condemnor-donee ignores those restrictions and pays nothing for a fee simple, while the condemnee-donor loses all value from his or her donation.

Here, the lease was part of a complicated agreement wherein the United States granted the City of San Diego fee title to an airport in exchange for various leaseholds and fee titles in and around the City. (Opp'n., Ex. A.) Unlike the donee who receives nothing for his grant and the condemnation of his reversionary interest, the Port's predecessor in interest received the benefit of its bargain. Finally, those courts found that equity favored compensating the donors because the condemnors were motivated by avoiding the gift's conditions. In *Living Desert Reserve*, the donee city condemned a donor's future interest in a desert wilderness park to build municipal golf course, and the undisputed evidence – including the city's resolution of necessity – showed that the city knew the use was inconsistent with the conditional gift of land, and was condemning the future interest to avoid the restrictions. 70 Cal. App. 4th at 619, 626-27. Here, the Port argues the United States is attempting to avoid the lease's use restrictions, evidenced by the fact that it is condemning the Port's interest as well as the tidelands trust interest. This is unpersuasive. The declaration of taking states that the United States is condemning the Port's interest to continue using the subject property for military purposes, and specifically, for use as an anti-submarine warfare training center. (*See* Doc. 2, Sched. A.) There is no evidence to suggest that the United States is condemning the Port's interest to use the subject property for anything other than a military base.

Finally, any valuation should take into account the lease terms covering improvements. *See Kimball Laundry Co. v. United States*, 338 U.S. 1, 16 (1949) (facts which would influence a ordinarily prudent buyer are admissible). The parties' experts agree that the current improvements (buildings) on the subject property do not reflect the highest and best use. The lease provides that the United States may abandon any improvements on the property. (*See* Doc. 49, Ex. 1, ¶5.) Because a buyer

would be required to demolish the buildings to convert the subject property to its highest and best use, the cost of such activity should be reflected in any valuation of the Port's interest.

## IV.

## CONCLUSION

For the foregoing reasons, a valuation of the Port's interest that is based on the difference between the subject property's unrestricted fee value and United States' leasehold value is not a reliable method under Fed. R. Evid. 702, and is therefore not admissible at trial.

**IT IS SO ORDERED.**

DATED: August 6, 2009

HON. DANA M. SABRAW
United States District Judge