1

2

3

4

5

6

7

8 **UNITED STATES DISTRICT COURT**

9 **SOUTHERN DISTRICT OF CALIFORNIA**

10

| | |
|---|---|
| 11 UNITED STATES OF AMERICA, | CASE NO. 05cv1137 DMS (WMc) |
| 12                                Plaintiff, | **ORDER: (1) DENYING DEFENDANT'S MOTION THAT VALUATION BE BASED ON PLAINTIFF BEING RESPONSIBLE FOR DEMOLITION; AND (2) GRANTING DEFENDANT'S MOTION TO EXCLUDE EVIDENCE OF PROPERTY TAX EFFECTS** |
| 13 | |
| 14        vs. | |
| 15 | |
| 16 | |
| 17 | |
| 18 32.42 ACRES OF LAND, MORE OR LESS LOCATED IN SAN DIEGO COUNTY STATE OF CALIFORNIA; et al, | [Docs. 56 & 57] |
| 19                                Defendants. | |
| 20 | |

21        Presently before the Court are two motions filed by Defendant San Diego Unified Port District

22 ("Port"), in which the Port seeks a ruling: (1) that valuation of the condemned property be based on

23 the Plaintiff United States being responsible for demolition of fixtures and structures affixed to the

24 land; and (2) excluding evidence of property tax effects on the value of the subject property.  For the

25 reasons set forth below, the Court denies the Port's motion for an order that Plaintiff is responsible for

26 demolition of fixtures and structures, and grants the Port's motion to exclude opinion testimony and

27 evidence of property tax effects on the value of the subject property.

28 / / /

# I.

## BACKGROUND

The United States has condemned 32.42 acres of tide and submerged lands located at the south side of North Harbor Drive at Nimitz Boulevard on the San Diego Bay. In 1949, as part of a comprehensive exchange agreement[1] between the United States and the City of San Diego, the Navy received a long-term lease of the property for 50 years with a right of renewal for an additional 50 years. (*See* Doc. 52, Ex. A.) The lease included several provisions, including: (1) the United States paid no rent; (2) the United States was given the right "to make alterations, attach fixtures, and erect additions, structures or signs in or upon the premises;" (3) the property could be used only for military purposes, and if there were a failure of that condition or if the property was abandoned, the property would revert to the City; and (4) the United States could not assign or sublet the leasehold. (Doc. 56, Ex. 1.)

In 1963, the City conveyed its interest in the property to the Port District. The Port remains the successor in interest to the property. On December 5, 1996, the Navy exercised its option to extend the lease for an additional 50 years. The Port and the California State Lands Commission ("Commission") opposed the extension on grounds that the lease was invalid. The United States then sought to condemn the Port and the Commission's interest in the subject property. Pursuant to the terms of a settlement in *United States v. 32.38 Acres of Land*, Case No. 99cv1622 (S.D.Cal. 2000), the United States was given a leasehold interest in the property through August 8, 2049.

On May 31, 2005, the United States filed the instant action to condemn the property, estimating just compensation at $237,500. In its declaration of taking, the United States asserts that it is condemning the Port's fee simple estate, including the State of California's tidelands trust rights and any subsurface or mineral rights, "but excluding the [leasehold] interest of the United States" and any public utility easements. (Doc. 2, Sched. C.) On January 6, 2006, the Port filed its objections to the United States' condemnation of the subject property. On January 9, 2006, the Commission filed a separate motion for summary judgment, challenging the United States' authority to extinguish the

---

[1] Under the agreement, the United States granted the City fee simple title to the property and improvements that are now San Diego's Lindbergh International Airport in exchange for eight leasehold interests and fee title to one property in and around the City of San Diego.

State's public trust rights in the land.  This Court issued an order overruling the Port's objections and

denying the Commission's motion on April 26, 2008.  (Doc. 24.)  The Commission's motion was

denied on grounds that the taking by the United States extinguished California's public trust easement.

(*Id.*, at 5-8.)  The Court found that:

> with respect to the 27.54 acres of lands which are filled and are not subject to the tidelands, the United States takes the lands free of any public trust restrictions.  As to the remaining 4.88 acres which are within the bulkhead line but remain tidelands, the United States acquires the property subject to its own federal trust.

(*Id.*)

Thereafter, on October 28, 2008, this Court issued an order determining that the land should

be valued as burdened by California's tidelands trust, but that condemnation of the trust itself – as a

nonpecuniary sovereign attribute – was not compensable.  (Doc. 43, at 8.)  On August 6, 2009, this

Court determined that the interest being condemned is the Port's reversionary lease fee interest, not

the leasehold interest.  (Doc. 55, at 5-6.)

## II.

## LEGAL STANDARD

Federal Rule of Civil Procedure 71.1 (renamed from Rule 71A in 2007) governs procedural

matters in a federal condemnation cases.  *Kirby Forest Indus., Inc. v. United States*, 467 U.S. 1, 3-4

(1984).  "In an action involving eminent domain under federal law, the court tries all issues, including

compensation, except when compensation must be determined" by a specially constituted tribunal,

jury, or court-appointed commission.  Fed. R. Civ. P. 71.1(h).  Rule 71.1 permits the jury to decide

only the "precise issue of the amount of compensation to be awarded," a decision which is to be made

"within ground rules established by the trial judge."  *United States v. Reynolds*, 397 U.S. 14, 20 (1970)

Consequently, the trial court is responsible for making preliminary determinations that affect the

valuation of condemned property.  *See Scott Lumber Co. v. United States*, 390 F.2d 388, 392 (9th Cir.

1968) (court determines legality of potential uses for condemned land prior to valuation).

"[J]ust compensation is the value of the interest taken."  *United States v. Petty Motor Co.*, 327

U.S. 372, 377 (U.S. 1946).  It is measured by "the market value of the property at the time of the taking

contemporaneously paid in money."  *Olson v. United States*, 292 U.S. 246, 255 (1934).  Market value

is defined as "the price which a reasonable seller who desires to sell but is not required to sell would

demand for the property and the price which a reasonable buyer who desired to buy but was not required to buy would pay for the same." *United States v. 429.59 Acres of Land*, 612 F.2d 459, 462 (9th Cir.1980). It is settled that just compensation is determined by the owner's loss, not the taker's gain. *United States ex rel T.V.A. v. Powelson*, 319 U.S. 266, 281 (1943). A property owner "is entitled to be put in as good a position pecuniarily as if his property had not been taken. He must be made whole but is not entitled to more." *Olson*, 292 U.S. at 255.

### III.

### DISCUSSION

### A. Demolition

The United States has constructed buildings on the subject property, and the parties agree that the buildings must be demolished in order to convert the property to its highest and best use. At issue is which party will bear the cost of demolition under the terms of the lease. Although this Court already has held that the Port will be responsible for demolition, (*see* Aug. 6, 2009 Order, p. 8-9), the issue is analyzed more fully below.

Paragraph five of the 1949 lease states:

> The Government shall have the right, during the existence of this lease, to make alterations, attach fixtures, and erect additions, structures or signs in or upon the premises hereby leased, which fixtures, additions, or structures so placed in or upon or attached to the said premises shall be and remain the property of the Government and may be removed therefrom by the Government prior to the termination of this lease, and the Government, if required by the Lessor, shall, before the expiration of this lease or renewal thereof, restore the premises to the same condition as that existing at the time of entering upon the same under this lease, reasonable and ordinary wear and tear and damages by the elements or by circumstances over which the Government has no control, excepted; provided, however, that if the lessor requires such restoration, the lessor shall give written notice thereof to the Government twenty (20) days before the termination of the lease. Any provision herein to the contrary notwithstanding, at the expiration or earlier termination of this lease, or any renewal thereof, the Government may, at its option, leave in place or abandon all or a part of its fixtures, additions, structures or signs in lieu of and in complete satisfaction and performance of the obligation imposed on the Government under Clause Fifth hereof; provided, however, that in the event the Government elects to remove a part only of its fixtures, additions, structures or signs, that said removal shall be accomplished in a good and workmanlike manner.

(Doc. 56., Exh. 1)

The Port argues this provision is ambiguous because it first states that the lessor may, upon notice, require the Government to restore the property to the same condition that existed at the time of the lease, but then provides the Government may abandon all fixtures, additions, structures, or signs. The Port argues there are two possible interpretations of this provision: (1) the lessor may require restoration regardless of when the Government terminates the lease, as long as the lessor provides 20 days notice to remove improvements; and (2) the Government may abandon the structures only if it terminates the lease early. The Port recognizes a third option, that the Government may abandon improvements and need not restore the land, regardless of the lessor's requests. The Port argues this third option is unreasonable because it renders the lessor's right to restoration superfluous.

Initially, the Port's attempt to insert ambiguity into the contract provision fails because it ignores the clause "Any provision herein to the contrary notwithstanding." The clause "notwithstanding" indicates that the provisions which follow override any other conflicting provision. *See Cisneros v. Alpine Ridge Group*, 508 U.S. 10, 17 (1993) ("[T]he use of such a 'notwithstanding' clause clearly signals the drafter's intention that the provisions of the 'notwithstanding' section override conflicting provisions of any other section.") Thus, regardless of any other provision, the Government may leave or abandon all or a part of its fixtures in lieu of and in complete performance of its obligations under the fifth clause of the contract. If the Government chooses to remove a portion of the fixtures, it must do so in a good and workmanlike manner.

Further, the two sentences of paragraph five can be reconciled in a manner that gives effect to every provision, and avoids rendering part of the contract surplusage. *United States v. 1.377 Acres of Land*, 352 F.3d 1259, 1266 (2003). The clause relating to the lessor's right to require restoration is written in conjunction with the Government's right to remove any structures from the premises. Removal and restoration are two separate concepts, *i.e.*, the Government could remove the structures without restoring the property to its original state. However, if the Government removes the structures, the lessor, upon proper notice, can require the Government to restore the property to its original condition. Alternatively, under the second sentence, the Government can choose to abandon the structures, in which case the lessor does not have a right of restoration. But if the Government removes part of the improvements, it must do so in a good and workmanlike manner.

1      The Port's proposed interpretations are unpersuasive. The Port first argues that the provisions

2 should be read so that the Government has a right to abandon fixtures only if the lessor fails to give

3 notice of restoration; however, the sentence granting the right of restoration to the lessor already states

4 that if the lessor requires restoration it "*shall* give written notice thereof to the Government twenty (20)

5 days before the termination of the lease." (Emphasis added.) The Port's interpretation reads the

6 second sentence out of the paragraph. Even without the second sentence, the Government would not

7 have to restore the property if the lessor failed to give notice.

8      The Port's second proposed interpretation requires adding language to the contract. The Port

9 proposes the following bracketed language be added to the second sentence: "at the expiration [of this

10 lease] or earlier termination of this lease, or any renewal thereof, the Government may, at its option,

11 leave in place or abandon" any improvements. The Port argues that under this reading, the

12 Government may abandon the improvements only if it terminates the lease or renewal early. This is

13 a strained interpretation of the lease. The lease contemplates that the Government may abandon the

14 improvements at the end of the lease or renewal, regardless whether the lease or renewal runs its full

15 course or terminates early.

16      Thus, under the terms of the lease, Plaintiff may abandon improvements on the subject

17 property. The Port's motion is denied.

18     **B.**    **Tax Effects**

19      During the parties' exchange of expert appraisal reports an issue arose as to the effect of

20 property taxes on the fair market value of the subject property. Plaintiff's valuation expert opines that

21 if a sale of the property did not trigger any property tax liability, the present value is $266,000.

22 However, if the sale would cause the property to be assessed for property taxes, the present value of

23 the tax obligation for the remaining term of the lease would outstrip the present value of the reversion,

24 leaving the property with a value of zero ($0).[2] (Gordon Decl., Exh. C.)

25      The Court finds persuasive the Port's argument that if the property is rendered unmarketable

26 because of taxes, then an alternative measure of just compensation should be used. Plaintiff argues

27

28      [2] Since the Port filed the instant motion, Plaintiff has received an opinion from the California State Board of Equalization that the property would be subject to property tax. (Gordon Supp. Decl., Exh. 1.) The Court renders no opinion on the accuracy or admissibility of this opinion.

that market value is the proper measure of just compensation, and if the market value is zero because of the property taxes, then the Port has not suffered a pecuniary loss.  The Port replies that it will not be made whole by a valuation in which it receives no compensation for 27 acres of bay front property.

Just compensation is designed "to put the owner of condemned property 'in as good a position pecuniarily as if his property had not been taken.'" *Olson*, 292 U.S. at 255.  This is most often calculated by determining the fair market value of the property, *i.e.*, "what a willing buyer would pay in cash to a willing seller" at the time of taking.  *United States v. 564.54 Acres of Land*, 441 U.S. 506, 510-11 (1979) (citing *United States v. Miller*, 317 U.S. 369, 374 (1943)).  However, fair market value is not the sole measure of just compensation.  *Id*. at 512.  Deviation from the market value standard may be required where market value is too difficult to determine, or where using it would result in manifest injustice.  *Id*.

Plaintiff's contention that the Port will not suffer a pecuniary loss if property taxes reduce the property's market value to zero is unavailing.  This Court has previously held that the interest being condemned is the Port's reversionary interest in the property, which is valued by determining the market value of the property in 2049 and then reducing that amount to its present value.  (Aug. 6, 2009 Order, p. 5-6.)  The resulting figure represents the amount one would need to invest at the time of taking, assuming a market interest rate, to receive the forecast fair market value.  (*Id*. at 6.)

The parties' experts have reached different conclusions as to the future market value of the property.  (Pl. Reply, Exhs. 1 & 2.)  Neither opinion, however, is that the 2049 market value is zero.  Absent condemnation, the Port would be entitled to hold the property, tax-free, until 2049, at which time it could realize the property's market value.  It would be manifestly unjust to hold that the Port's interest is zero because a hypothetical buyer would have to pay property taxes for over 40 years on property he or she could not use or possess.

In *United States v. Douglas*, 207 F.2d 381 (9th Cir. 1953), the land being condemned was subject to certain property restrictions.  Under the restrictions, if the landowner sold the property within a certain time frame he was entitled to only $8 per acre.  If he held on to the property beyond the restricted time frame, the property would be worth much more.  The trial court instructed the jury to assume that in a hypothetical sale, the seller could sell for more than $8 an acre, but that the buyer

would step into the shoes of the seller and buy the property subject to the same property restrictions. *Id*. at 383.  Thus, the amount of just compensation was the amount a buyer would willingly pay for the property, knowing he would not be able to sell it for a certain period of time.  *Id*.

Likewise, it is appropriate here to assume a hypothetical buyer steps into the shoes of the Port. The hypothetical buyer gains no interest until 2049 and assumes risk on the future value of the property, but does not have to pay property taxes for the duration of the lease.  Thus, the Port's motion to exclude opinion testimony and evidence based on considerations of property tax effects on the value of the property is granted.

## IV.

## CONCLUSION

For the foregoing reasons, the Port's motion for an order determining that valuation be based on Plaintiff being responsible for demolition is denied.  The Port's motion to exclude opinion testimony and evidence of the property tax effects on the value of the property is granted.

**IT IS SO ORDERED.**

DATED:  December 14, 2009

_____
HON. DANA M. SABRAW
United States District Judge